# IN THE SUPREME COURT OF CALIFORNIA

In re CHRISTOPHER L., a Person Coming Under the Juvenile Court Law.

---

LOS ANGELES COUNTY DEPARTMENT OF
CHILDREN AND FAMILY SERVICES,
Plaintiff and Respondent,

v.

CARLOS L.,
Defendant and Appellant.

S265910

Second Appellate District, Division One
B305225

Los Angeles County Superior Court
17CCJP02800

---

April 25, 2022

In re CHRISTOPHER L.

Opinion of the Court by Liu, J.

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Peña* concurred.

---

*      Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re CHRISTOPHER L.

S265910


Opinion of the Court by Liu, J.


California law requires the appointment of counsel for parents whose children are subject to dependency proceedings before the juvenile court. When such parents are incarcerated, the law specifically provides for notice and the opportunity to be present, and prohibits a juvenile court from adjudicating a dependency petition without the presence of both counsel and the incarcerated parent except upon affirmative waiver by the parent. These requirements, among others, protect the parent's interest in maintaining the parent-child relationship and the child's interest in having a dependency petition decided on the basis of all factors that bear on the child's well-being.

Here we decide whether it is structural error, and thus reversible per se, for a juvenile court to proceed with a hearing to determine its jurisdiction over a child and disposition of the wardship petition without an incarcerated parent's presence and without appointing counsel for the parent. We hold, as did the Court of Appeal, that while the provisions for presence and appointment of counsel are important protections for both the parent and the child, the juvenile court's failure to comply does not require reversal per se.

**I.**

Christopher L. was born in December 2017 with a positive toxicology screen for amphetamines. The Los Angeles County Department of Children and Family Services (Department) filed

1

a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b)(1), alleging that Christopher and his 10-month-old sibling, I.L., were at risk due to their mother's (Mother) history of substance abuse and their respective fathers' history of drug abuse, as well as Carlos L.'s criminal history. (All undesignated statutory references are to the Welfare and Institutions Code.)

The initial petition listed Carlos L. as I.L.'s alleged father and another man as Christopher's alleged father. But the juvenile court was also presented with documents establishing that Carlos L. was entitled to "presumed father" status with respect to Christopher, which carries with it the right to appointed counsel. (*In re Christopher L.* (2020) 56 Cal.App.5th 1172, 1177 (*Christopher L.*); see *In re T.R.* (2005) 132 Cal.App.4th 1202, 1209; § 317.) Like the Court of Appeal, we refer to Carlos L. as Father.

The petition alleged that Mother's ongoing substance abuse and Father's criminal history and conduct placed the children at risk of serious physical harm. The petition and detention report also alleged that Mother and Father each had other children who were prior dependents of the court and had received permanent placement services. Based on these allegations, the Department indicated it might seek an order denying family reunification services pursuant to section 361.5, subdivision (b)(10) and (11), which allows the court to bypass the usual provision of reunification services, thus paving the way for termination of parental rights.

At the time the children were detained and throughout the course of these proceedings, Father was incarcerated at the Sierra Conservation Center, a fire camp operated by the

Department of Corrections and Rehabilitation. As relevant here, the Penal Code provides: "In a proceeding . . . brought under Section 300 of the Welfare and Institutions Code, if the proceeding seeks to adjudicate the child of a prisoner a dependent child of the court, the superior court of the county in which the proceeding is pending, or a judge thereof, shall order notice of any court proceeding regarding the proceeding transmitted to the prisoner." (Pen. Code, § 2625, subd. (b).) "Upon receipt by the court of a statement from the prisoner or the prisoner's attorney indicating the prisoner's desire to be present during the court's proceedings, the court shall issue an order for the temporary removal of the prisoner from the institution, and for the prisoner's production before the court." (*Id.*, subd. (d).) With exceptions not relevant here, "a petition to adjudge the child of a prisoner a dependent child of the court . . . may not be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or a designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding." (*Ibid.*)

Neither parent, nor counsel for either parent, appeared at the detention hearing. The juvenile court found that the Department made a prima facie case for detention, set a combined jurisdiction and disposition hearing for March 2018, and ordered the Department to give notice to the parents.

The Department provided notice to Father of the pending jurisdiction and disposition hearing. He responded: "I wanted to ask if a court appearance is necessary. In your letter you

3

stated that a court date of 3/9/18 will be set. The reason why I'm asking is that this court date will delay my process on being transferred to a California Fire Camp. If possible I was wondering can this matter be handled over the telephone. If so, it would be very much appreciated if we took that route. I love my kids and I will do anything in my power to be with them. The faster I get to camp, the faster I'll be home. . . . Please inform me of my options if a court appearance is needed to handle this matter." Father's letter requested paternity testing for both children but indicated that regardless of the outcome, he would "love them as my own" and consider them "my kids." Father's letter was mentioned in and attached to the report prepared in anticipation of the jurisdiction and disposition hearing.

Neither Father nor counsel for Father appeared at the March 2018 combined jurisdiction and disposition hearing. The juvenile court suggested that the onus was on Father to make himself available and said, contrary to Father's letter, that he had "not made himself available," adding: "[H]e's been noticed, but he's made no contact with [the Department]." After hearing brief argument from the Department and counsel for the minors, the court sustained the petition as to both Father and Mother and denied the parents reunification services for both children. The court found it to be "in the best interest of these children to set a hearing to select a permanent plan of adoption, guardianship, or other planned living arrangements with a relative or foster care provider."

In November 2018, the court appointed counsel for Father. Counsel stated that Father objected to the Department's request to terminate parental rights, and the matter was continued to the next month. In December, Father made his first personal

appearance in this case, via telephone. At counsel's request, the court ordered DNA testing to determine Christopher's paternity and continued the proceedings as to Christopher. The court terminated parental rights as to I.L.

Christopher's permanency hearing was held in March 2020. Father was present telephonically and represented by appointed counsel. Counsel objected to the termination of parental rights but presented no evidence and offered no argument. The court terminated Father's parental rights.

As relevant here, Father argued on appeal that he was denied due process of law at the combined jurisdiction and disposition hearing in March 2018 because it was conducted in his absence and without counsel present on his behalf. (*Christopher L.*, *supra*, 56 Cal.App.5th at pp. 1176–1177.) The Court of Appeal agreed with Father that his status as presumed father of Christopher based on his marriage to Mother entitled him to appointed counsel at the hearing, and it held that the juvenile court violated Penal Code section 2625 by conducting the hearing without Father or his counsel being present and without a signed waiver from Father. (*Christopher L.*, at pp. 1184–1185, citing *In re Jesusa V.* (2004) 32 Cal.4th 588, 621–622.) These errors, the Court of Appeal concluded, "affected the due process afforded Father at the jurisdiction/disposition hearing in that they denied him counsel at that hearing." (*Christopher L.*, at p. 1177.)

Although the Court of Appeal agreed with Father that these errors violated due process, it held that automatic reversal was not warranted. Citing *In re James F.* (2008) 42 Cal.4th 901, 915 (*James F.*), the court explained that not every due process error in dependency proceedings is reversible per se and that

5

reviewing courts "should first consider whether an error in dependency proceedings is amenable to harmless error analysis — that is, whether potential prejudice from the error can be assessed without 'necessarily requir[ing] "a speculative inquiry into what might have occurred in an alternate universe" ' [citation] — and, if so, apply a harmless error analysis." (*Christopher L., supra*, 56 Cal.App.5th at p. 1186.) The court determined that it could assess whether the juvenile court's errors prejudiced Father in later proceedings based on the undisputed facts before it. The relevant inquiry, according to the Court of Appeal, was whether there was a reasonable probability of a more favorable outcome (*People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)) if Father had been present at the March 2018 hearing or had been represented by counsel. (*Christopher L.*, at p. 1188.)

The Court of Appeal concluded that the bypass provisions under subdivisions (b)(10), (b)(12), and (e) of section 361.5 applied to Father, and that Father could not have demonstrated that it would be in Christopher's best interests to provide reunification services because Father had never met Christopher and acknowledged having little to no relationship with either child, and he would remain in custody past the maximum reunification period. (*Christopher L., supra*, 56 Cal.App.5th at pp. 1190–1191.) On those grounds, the Court of Appeal held that the juvenile court's errors were harmless under either the standard for state law error (*Watson, supra*, 46 Cal.2d at p. 835) or the standard for federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)).

We agree with the Court of Appeal that the juvenile court erred in failing to appoint counsel for Father for the combined jurisdiction and disposition hearing and also failed to comply

with Penal Code section 2625. The question is whether it is structural error, and thus reversible per se, for a juvenile court to proceed with a jurisdiction and disposition hearing without an incarcerated parent's presence and without appointing the parent an attorney.

## II.

The California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. ([*Watson*, *supra*,] 46 Cal.2d [at p.] 835.)" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) Federal constitutional errors require reversal unless the beneficiary of the error can show it was "harmless beyond a reasonable doubt." (*Chapman*, *supra*, 386 U.S. at p. 24.)

But not all errors are amenable to harmless error analysis. We have, "in a number of contexts, [found] that certain errors, by their nature, result in a 'miscarriage of justice' within the meaning of the California harmless-error provision requiring reversal without regard to the strength of the evidence received at trial." (*People v. Cahill* (1993) 5 Cal.4th 478, 493 (*Cahill*).) For example, per se reversal is required when a court refuses or fails to allow a party to present its entire case before the trier of

fact (*Fewel v. Fewel* (1943) 23 Cal.2d 431, 433), when there is improper discrimination in jury selection (*People v. Wheeler* (1978) 22 Cal.3d 258, 283), or when a codefendant is denied the right to separate counsel (*People v. Douglas* (1964) 61 Cal.2d 430, 437–439).

The same is true under federal law. In holding that some errors of a constitutional dimension are amenable to harmless error analysis, the court in *Chapman* also recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error . . . ." (*Chapman, supra*, 386 U.S. at p. 23.) This category includes deprivation of the right to counsel (*Gideon v. Wainwright* (1963) 372 U.S. 335) and denial of the right to trial by an impartial judge (*Tumey v. Ohio* (1927) 273 U.S. 510). (*Chapman*, at p. 23, fn. 84; see *Arizona v. Fulminante* (1991) 499 U.S. 279, 309–310 (*Fulminante*).)

We adopted the term "structural" error in accordance with its usage in *Fulminante*: "[J]ust as the United States Supreme Court recognized in its recent *Fulminante* decision that certain federal constitutional errors representing 'structural defects in the constitution of the trial mechanism' are not amenable to harmless error analysis (*Fulminante, supra*, 499 U.S. [at p.] 309–310 (opn. by Rehnquist, C. J.)), under the California constitutional harmless-error provision some errors similarly are not susceptible to the 'ordinary' or 'generally applicable' harmless-error analysis . . . and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case." (*Cahill, supra*, 5 Cal.4th at p. 493.)

**A.**

In *James F.*, we observed that the high court had not applied structural error analysis "outside the context of criminal proceedings" (*James F.*, *supra*, 42 Cal.4th at p. 917), and we cautioned against "import[ing] wholesale, or unthinkingly," the analysis of structural error from criminal cases into other contexts (*id.* at p. 916). At the same time, we have never held that structural errors can arise only in the criminal context. (Cf. *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233 [holding that an error regarding who should interpret a class action provision in an arbitration agreement was not amenable to prejudice analysis].)

Father asks us to import the rule of structural error into the dependency context. We considered in *James F.* whether a procedural error in appointing a guardian ad litem for a parent in a dependency proceeding was amenable to harmless error analysis. The superior court in that matter failed to "explain to [the parent] what a guardian ad litem is or what powers a guardian ad litem has, nor did the court give [the parent] a meaningful opportunity to be heard in opposition to the appointment, and it inaccurately told [the parent] that the guardian ad litem was his 'second lawyer.'" (*James F.*, *supra*, 42 Cal.4th at p. 911.) We concluded that the juvenile court's failure to follow the proper procedure in appointing a guardian ad litem was amenable to harmless error analysis because "[d]etermining prejudice in this context does not necessarily require 'a speculative inquiry into what might have occurred in an alternate universe.'" (*Id.* at p. 915.)

In reaching this holding, we observed that "[t]he rights and protections afforded parents in a dependency proceeding are

not the same as those afforded to the accused in a criminal proceeding." (*James F.*, *supra*, 42 Cal.4th at p. 915.) "For example, a juvenile court may rely on hearsay contained in a social worker's report to support a jurisdictional finding in a dependency case, although such evidence could not be used to establish guilt in a criminal proceeding. [Citation.] Also, unlike a defendant in a criminal proceeding, '[a] parent at a dependency hearing cannot assert the Fourth Amendment exclusionary rule, since "the potential harm to children in allowing them to remain in an unhealthy environment outweighs any deterrent effect which would result from suppressing evidence" unlawfully seized.' " (*Ibid.*) "These significant differences between criminal proceedings and dependency proceedings," among others, "provide reason to question whether the structural error doctrine that has been established for certain errors in criminal proceedings should be imported wholesale, or unthinkingly, into the quite different context of dependency cases." (*Id.* at pp. 915–916.)

As Father observes, *James F.* did not address or disturb several Court of Appeal decisions that had found structural error in the dependency context, including cases involving failure to provide notice to the parent. (See, e.g., *In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1116 [failure to give proper notice to a parent facing termination of her parental rights]; *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 558 [failure to timely serve report recommending termination of reunification services in advance of a dependency hearing]; *In re Josiah S.* (2002) 102 Cal.App.4th 403, 417–418 [improper denial of a parent's request for a contested hearing in a dependency proceeding]; *In re Kelly D.* (2000) 82 Cal.App.4th 433, 440 [failure to provide notice and a contested hearing on the issue of

visitation frequency "resulted in a miscarriage of justice" requiring reversal of the order, with no discussion of prejudice]; *In re James Q.* (2000) 81 Cal.App.4th 255, 268 [conditioning a contested hearing on an offer of proof was a "miscarriage of justice"].)   Moreover, we took care to note that there was no indication the father in *James F.* was " 'stripped . . . of his right to participate' ": "Nothing suggests that [the father] was unable to express his wishes to the court, either directly or through his appointed guardian, that he lacked actual notice of the proceedings as they unfolded, that the guardian and the attorney appointed for [the father] failed to properly advocate for his parental interests, or that [the father] ever expressed dissatisfaction with the guardian ad litem or asked the juvenile court to vacate her appointment." (*James F.*, *supra*, 42 Cal.4th at p. 917.) We explained: "[T]he use of flawed procedures in the appointment of a guardian ad litem for a parent does not inevitably and necessarily render dependency proceedings unfair in any fundamental sense" because "it is reasonable to infer, in the absence of evidence to the contrary, that a guardian ad litem has acted zealously to preserve the parent's interest in the companionship, care, and custody of the child, and thus that the parent benefited from the guardian ad litem's appointment." (*Id.* at p. 918.)

In sum, although we declined to find structural error in *James F.*, we did not foreclose its application in the dependency context.

## B.

With this background, we turn to the question before us: whether the juvenile court's failure here to appoint counsel or provide for Father's presence at the combined jurisdiction and

disposition hearing is structural error. We begin by acknowledging that these errors are quite serious. The hearing at issue is when the juvenile court determines whether there are sufficient grounds to assert jurisdiction over the child and whether family reunification services will be provided. (1 Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) §§ 2.100, 2.122 (Seiser).) Not only are the stakes for the parent weighty, but also "it is implicit in the juvenile dependency statutes that it is always in the best interests of a minor to have a dependency adjudication based upon all material facts and circumstances and the participation of all interested parties entitled to notice." (*Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 490–491 (*Ansley*).) The right to counsel and participation not only protects the parent's interests but also ensures that the juvenile court has the fullest picture of the relevant facts before disposing of a dependency petition.

It is not sufficient that Father was appointed counsel and was present telephonically at the permanency planning proceeding. The focus of that proceeding is different: " 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' . . . 'A [permanency planning] hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' . . . It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53, citations omitted.) Once a dependency proceeding moves into permanency planning, "the question is no longer whether the child should be returned to the parent, an issue already decided in the negative with the permanent plan of return to the parent

having been rejected. Instead, the issue is whether the child is adoptable and what the alternative permanency plan should be." (Seiser, *supra*, § 2.171; see *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 [discussing the proceedings under § 366.26 after reunification services have been denied or terminated]; *In re Celine R.*, at p. 53 ["Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."].) Thus, unlike the father in *James F.*, Father here was denied " 'his right to participate' " in a critical stage of a dependency case when the juvenile court failed to appoint counsel or provide for Father's presence at the combined jurisdiction and disposition hearing. (*James F.*, *supra*, 42 Cal.4th at p. 917.)

In classifying the error here, we draw on *Weaver v. Massachusetts* (2017) 582 U.S. __ [137 S.Ct. 1899] (*Weaver*), which explained that "[t]here appear to be at least three broad rationales" for treating an error as structural. (*Id.* at p. __ [137 S.Ct. at p. 1908].) "First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest. This is true of the defendant's right to conduct his own defense, which, when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant.' . . . [¶] Second, an error has been deemed structural if the effects of the error are simply too hard to measure. For example, when a defendant is denied the right to select his or her own attorney, the precise 'effect of the violation cannot be ascertained.' [Citation.] Because the government will, as a result, find it almost impossible to show that the error was

'harmless beyond a reasonable doubt,' [citation], the efficiency costs of letting the government try to make the showing are unjustified. [¶] Third, an error has been deemed structural if the error always results in fundamental unfairness. For example, if an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one. [Citations.] It therefore would be futile for the government to try to show harmlessness." (*Ibid.*) "These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." (*Ibid.*)

The first of the three *Weaver* rationales asks whether "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." (*Weaver, supra*, 582 U.S. at p. __ [137 S.Ct. at p. 1908].) As an illustration, *Weaver* mentions a criminal defendant's right to conduct his or her own defense, "which, when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant.'" (*Ibid.*) "That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty. [Citation.] Because harm is irrelevant to the basis underlying the right, the Court has deemed a violation of that right structural error." (*Ibid.*)

Here, the value of counsel and the parent's presence at dependency proceedings is not limited to ensuring proper presentation of the parent's position; it also ensures that the juvenile court has the fullest picture of the relevant facts before disposing of a dependency petition. But this interest in the accuracy of the proceedings is not easily distinguished from the

parent's own interest because it also serves to protect the parent from an erroneous determination. To that extent, it differs from the example *Weaver* offers to illustrate the first rationale and does not counsel in favor of treating the error here as structural.

Nor does *Weaver*'s second rationale for finding structural error have applicability here. We find it significant, as did the Court of Appeal, that the question of whether the errors here were harmless does not invariably require "a speculative inquiry into what might have occurred in an alternate universe." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 150.) We discuss at some length the Court of Appeal's assessment of prejudice not to express our view on whether the juvenile court's errors were harmless (that issue is not before us), but rather to examine the feasibility of harmless error analysis in this context.

The Department asked the juvenile court to exercise jurisdiction over Christopher and his sister based on allegations that Father's criminal history and substance abuse endangered the children's health and safety and placed them at risk of serious physical harm. The Court of Appeal understood Father to have conceded that the juvenile court acted properly in sustaining the allegations and exercising jurisdiction over Christopher (*Christopher L.*, *supra*, 56 Cal.App.5th at p. 1189, fn. 5); the only question was whether the court properly denied reunification services to Father. (Cf. *post*, at pp. 17–18.)

"Section 361.5, subdivision (b) contains several reunification 'bypass provisions' permitting (or, in some cases, requiring) a court to deny a parent reunification services" when it finds by clear and convincing evidence that one or more of the bypass provisions apply. (*Christopher L.*, *supra*, 56 Cal.App.5th

at p. 1189.) Two bypass provisions are relevant here. First, section 361.5, subdivision (b)(10)(A) is applicable in light of the fact that a juvenile court had previously "ordered termination of reunification services for . . . half siblings of [Christopher] because [Father] failed to reunify with the . . . half sibling[s]," and "has not subsequently made a reasonable effort to treat the problems that led to removal of the . . . half sibling of [Christopher] from that [Father]." (§ 361.5, subd. (b)(10)(A).) As the Court of Appeal explained, "Father does not challenge the applicability of this bypass provision, nor could he. Father failed to reunify with two of his older children in dependency proceedings based on substance abuse issues, and Father has since continued his drug-related criminality. Even if Father could offer evidence of efforts to address these issues, no such efforts could have supported a 'reasonable effort to' address finding (see § 361.5, subd. (b)(10)), given Father's continuous drug-related criminality." (*Christopher L.*, at p. 1189.)

Second, it is also undisputed that section 361.5, subdivision (b)(12) is relevant. Father had been convicted of a violent felony (robbery), for which he was incarcerated at the time of these proceedings. (§ 361.5, subd. (b)(12) ["Reunification services need not be provided . . . when the court finds, by clear and convincing evidence . . . [¶] . . . [¶] . . . the parent or guardian of the child has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code"].)

When either of these bypass provisions applies, reunification services "shall not" be ordered unless the juvenile court finds, "by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).) In this court, as in the Court of Appeal, "Father makes no attempt to argue how a court could have concluded that services would

16

have been in Christopher's best interest, nor does he argue the bypass provision under section 361.5, subdivision (b) is inapplicable." (*Christopher L., supra,* 56 Cal.App.5th at p. 1190.)

We emphasize, as did the Court of Appeal, that the fact of a parent's incarceration is not itself dispositive in the prejudice analysis. (See *Christopher L., supra,* 56 Cal.App.5th at p. 1192 ["there is no ' "go to prison, lose your child" ' law in California"], quoting *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402.) Section 361.5, subdivision (e)(1) requires the court to order "reasonable" reunification services to incarcerated parents "unless the court determines, by clear and convincing evidence, those services would be detrimental to the child." The statute enumerates numerous factors for consideration, and the Court of Appeal identified the following as the most relevant here: "the age of the child, the degree of parent-child bonding, the length of the sentence, . . . the nature of the crime . . . , the degree of detriment to the child if services are not offered . . . , the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations . . . , and any other appropriate factors." (§ 361.5, subd. (e)(1); see *Christopher L., supra,* 56 Cal.App.5th at p. 1190.) On the facts of this case, the court concluded, "[T]here is not a reasonable probability that reunification services would not be detrimental to Christopher — even if Father had had counsel to advocate against such a finding. . . . Father is not eligible for parole until approximately three years after Christopher was first detained, so Father's incarceration would have fallen well outside the maximum reunification period, even if the court permitted an extension beyond the applicable six-month limit for children under three years old. (See § 361.5, subd. (a)(1)(B), (3)(A) &

(4)(A).) As such, any services the court might order could not have successfully reunified Father with Christopher within the statutory time frame, which section 361.5, subdivision (e)(1) instructs they must in order to avoid proceeding to a permanency planning hearing." (*Christopher L., supra*, 56 Cal.App.5th at pp. 1190–1191.)

Importantly, the statutory scheme provides a mechanism for reconsideration of the court's prior orders had Father believed there were grounds to do so. Section 388 authorizes a parent "or other person having an interest in a child who is a dependent child of the juvenile court" to petition the juvenile court "to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (*Id.*, subd. (a)(1); see *Ansley, supra*, 185 Cal.App.3d at pp. 481, 487–488.) The petition — sometimes referred to as an "*Ansley* motion" — must allege why the requested change is "in the best interest of the dependent child." (§ 388, subd. (b)(1).) Section 388 further says: "If it appears that the best interests of the child or the nonminor dependent may be promoted by the proposed change or order . . . the court shall order that a hearing be held . . . ." (§ 388, subd. (d).) However, the court may summarily deny the motion if the petition fails to make a prima facie showing (1) that a change of circumstances or new evidence requires a changed order, and (2) that the requested change would promote the best interests of the child. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

In his briefing before this court, Father belatedly offers two theories of prejudice that should have been presented to the juvenile court in the first instance as possible grounds for reconsideration. First, he suggests that if he had attended the March 2018 jurisdiction hearing, he could have persuaded the

juvenile court that because he was a nonoffending parent and could have arranged for the children to be cared for by a relative while he served his prison term, there was no need for the court to assume jurisdiction over the children. Second, he says he might have persuaded the juvenile court to reject the jurisdictional allegations against him as "stale," thus rendering him a nonoffending parent. But the jurisdictional report indicates that Father appears to have been arrested for burglary just eight months before these proceedings; that was the charge for which he was then serving a seven-year sentence. The facts here are readily distinguishable from those in *In re Isayah C.* (2004) 118 Cal.App.4th 684, upon which Father relies. In *Isayah C.*, the Department did not file allegations against the father and conceded he was a nonoffending parent (*id.* at pp. 688, 695), the father had joint custody of the child (*id.* at p. 688), he was under arrest due to accusations made by the child's mother (*id.* at pp. 687, 689), and he articulated a plan to send his child to identified relatives "pending his relatively short incarceration" (*id.* at p. 700).

In any event, these arguments were not presented in a motion for reconsideration under section 388, nor were they presented to the Court of Appeal when the question of prejudicial error was decided. Had Father presented these arguments below, they could have informed the Court of Appeal's assessment of prejudice. But even if such arguments might have made it more difficult to show that the errors here were harmless, that does not mean the errors are not amenable to harmless error review. It would simply mean that the errors are "more likely to be prejudicial under the traditional harmless-error standard." (*Cahill, supra,* 5 Cal.4th at p. 503.) The fact that the statutory scheme enabled the Court of Appeal

to assess prejudice based on the arguments before it weighs against a conclusion that the errors require automatic reversal.

Finally, we turn to *Weaver*'s third rationale for structural error: whether the error "always results in fundamental unfairness." (*Weaver, supra*, 582 U.S. at p. __ [137 S.Ct. at p. 1908].) It is this rationale, *Weaver* explains, that calls for automatic reversal when "an indigent defendant is denied an attorney or if the judge fails to give a reasonable-doubt instruction." (*Ibid.*) Here, we note the significant differences between criminal and dependency proceedings, as articulated in *James F.*: "In a criminal prosecution, the contested issues normally involve *historical* facts (what precisely occurred, and where and when), whereas in a dependency proceeding the issues normally involve evaluations of the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements." (*James F., supra*, 42 Cal.4th at p. 915.) The presence of counsel generally helps to facilitate this assessment by ensuring that a more complete picture of the parent's interests and ability to provide for the child's care are presented to the court. But it does not follow that the absence of counsel invariably results in unfairness in light of the statutory scheme governing reunification services. Nor does it follow that absence of counsel from one stage of the proceeding necessarily renders the entire proceeding fundamentally unfair, especially where, as here, counsel was provided after the jurisdiction and disposition hearing, and could have utilized a statutory mechanism to seek reconsideration of any prior order by the juvenile court.

*Weaver* cautions that "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case." (*Weaver, supra*, 582 U.S. at p. __ [137 S.Ct. at

p. 1908].)  But in the dependency context, automatic reversal for errors that do not invariably lead to fundamental unfairness would exact a particularly steep cost.  "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged."  (*Lehman v. Lycoming County Children's Services* (1982) 458 U.S. 502, 513–514.)  "We emphatically agree that dependent children have a critical interest in avoiding unnecessary delays to their long-term placement."  (*In re A.R.* (2021) 11 Cal.5th 234, 249; see *James F.*, *supra*, 42 Cal.4th at p. 915 ["the ultimate consideration in a dependency proceeding is the welfare of the child [citations], a factor having no clear analogy in a criminal proceeding"].)  And we have repeatedly underscored the need to avoid delay in this context.  (See, e.g., *In re Sade C.* (1996) 13 Cal.4th 952, 993 [noting "the pointed and concrete harm that the child may suffer" from prolonged proceedings]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [children have a "compelling right[] . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child"].)  Accordingly, we decline to adopt a rule of automatic reversal in cases involving the errors that occurred here.

We caution that such assessment of harmlessness is unlikely to be available in every instance where a parent has been denied the right to counsel and the right to be present at a combined jurisdiction and disposition hearing.  These rights serve to ensure the fairness and reliability of the adversarial process, and there is likely to be "a grey area between the margins where the difference appointed counsel [or the parent's presence] might have made during a dependency proceeding will

be more difficult to reliably assess." (*In re. J.P.* (2017) 15 Cal.App.5th 789, 803 (conc. opn. of Baker, J.).) The fact that harmlessness is ascertainable here counsels against a rule of automatic reversal. But appellate courts should be wary of finding harmless error "[w]hen a counterfactual inquiry appears too difficult to responsibly undertake, or a counterfactual conclusion relies on inferences that really amount to guesswork." (*Id.* at p. 804 (conc. opn. of Baker, J.).)

## C.

Finally, we address Father's argument that the errors here are analogous to a complete deprivation of notice. (Cf. *In re Jasmine G.*, *supra*, 127 Cal.App.4th at p. 1116; *In re Kelly D.*, *supra*, 82 Cal.App.4th at pp. 439–440.) Father acknowledges that the Department provided notice of the combined jurisdiction and disposition hearing, but he says, "[T]he trial court's fundamental error in not acknowledging petitioner's response to the notice that he did receive, has, in effect, resulted in a lack of notice altogether." He asks: "What is the difference between a lack of notice and the failure of the trial court to acknowledge the defendant's desire to contest the matter after notice has been given?"

The Courts of Appeal that have addressed notice errors in the dependency context have attempted to draw a line between cases in which there was a complete deprivation of notice and cases in which there was some lesser defect as to notice, with only the former requiring automatic reversal. (See, e.g., *In re Marcos G.* (2010) 182 Cal.App.4th 369, 387 ["When there is no attempt to serve a parent with notice the error is reversible per se; when there is error in a notice the question is whether the error is harmless beyond a reasonable doubt."].) One court has

explained that it "is the difference between a sound structure which fails due to human error and an unsound structure which can never support a fair process." (*In re Jasmine G.*, *supra*, 127 Cal.App.4th at p. 1118.) The rationale may be that automatic reversal is necessary to deter egregious negligence when the state fails to even attempt to give notice. A complete failure of the state process may also implicate dignity concerns not present when human error results in a notice defect.

We express no view on the cases that have applied a rule of automatic reversal where there was a complete absence of notice. We note only that there was no failure to give notice here, and no indication that the juvenile court's or the Department's failure to act properly on Father's response to the notice arose from anything other than ordinary human error, or that the mistake at one stage of the proceedings rendered the entire process fundamentally unfair.

To be sure, Father's right to be present with counsel at the hearing may serve a dignitary interest apart from its utility in ensuring the reliability of the outcome. (Cf. *Weaver*, *supra*, 582 U.S. at p. __ [137 S.Ct. at p. 1908] [structural error may arise from violation of a right that "is not designed to protect the defendant from erroneous conviction but instead protects some other interest"].) But Father did receive proper notice of the hearing, was present and represented at later hearings, and had recourse to a mechanism for reconsideration. Any additional dignitary interest that might be served by the juvenile court acknowledging his desire to contest the matter is, in our view, insufficient to justify a rule of automatic reversal when weighed against Christopher's "critical interest" in permanent placement. (*In re A.R.*, *supra*, 11 Cal.5th at p. 249.)

In sum, the juvenile court committed serious errors when it proceeded with a combined jurisdiction and disposition hearing without appointing counsel for Father or providing for his presence at the hearing.  But the prejudicial effects of such errors, if any, are not beyond the ability of the courts to assess.  Although this may not be true in all cases involving such errors, the fact that it is true at least in cases like this one — together with the "critical interest" that "dependent children have . . . in avoiding unnecessary delays to their long-term placement" (*In re A.R.*, *supra*, 11 Cal.5th at p. 249) — leads us to conclude that a rule of automatic reversal is unwarranted.

The question before us is limited to whether the errors here require automatic reversal.  We do not decide whether the errors, singly or in combination, are subject to the prejudice standard for state law error (see *Watson*, *supra*, 46 Cal.2d at p. 835) or the more stringent standard for federal constitutional error (see *Chapman*, *supra*, 386 U.S. at p. 24).  Nor do we decide the merits of the Court of Appeal's determination that the errors were harmless under either prejudice standard, as that issue is beyond the scope of the question on which we granted review.

**CONCLUSION**

We affirm the judgment of the Court of Appeal.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**PEÑA, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Christopher L.

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 56 Cal.App.5th 1172
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S265910
**Date Filed:** April 25, 2022

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Marguerite D. Downing

_____

**Counsel:**

Christopher Blake, under appointment by the Supreme Court, for Defendant and Appellant.

Mazanec Law, Nicholas J. Mazanec; and Suzanne M. Nicholson for California Appellate Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant.

Mary C. Wickham and Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer B. Henning; and Johannah L. Hartley, Deputy County Counsel (Santa Barbara), for the California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christopher Blake
P.O. Box 90218
San Diego, CA 92169
(858) 274-1722

Sarah Vesecky
Deputy County Counsel
500 West Temple Street, 6th Floor
Los Angeles, CA 90012
(213) 808-8777